# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 07-3426

_____

Central Iowa Power Cooperative,

        Appellant,

    v.

Midwest Independent Transmission System Operator, Inc.; Afton, Iowa; Amana Society Service Co.; Anita Municipal Utilities; Anita, IA; Coggon Municipal Light Plant; Coggon, IA; Dysart, IA; Farmers Electric Cooperative; Frytown, IA; Grand Junction Municipal Light Plant; Grand Junction, IA; Hopkinton Municipal Utility; Hopkinton, IA; LaPorte City Utilities; LaPorte City, IA; Long Grove, IA; Maquoketa, IA; New London Municipal Utilities; New London, IA; Ogden Municipal Utilities; Ogden, IA; Preston, IA; Resale Power Group of Iowa; Stanhope, IA; State Center, IA; Story City Municipal Electric Utilities; Story City, IA; Strawberry Point Utilities; Strawberry Point, IA; Tipton, IA; Traer Municipal Utilities; Traer; Vinton Municipal

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Appeal from the United States District Court for the Northern District of Iowa.

[PUBLISHED]

Electric Utility; Vinton, IA; West          *
Liberty, IA,                                *
                                            *
          Appellees.                        *

———————————

Submitted: May 12, 2008
Filed: March 27, 2009

———————————

Before RILEY, BOWMAN, and HANSEN, Circuit Judges.

———————————

HANSEN, Circuit Judge.

Appellant Central Iowa Power Cooperative (CIPCO), a generation and transmission electrical power cooperative, sued the appellees Midwest Independent Transmission System Operator, Inc. (MISO), the Resale Power Group of Iowa (RPGI), and members of RPGI in Iowa state court. CIPCO raised state law implied contract and tort claims, generally alleging that the appellees had either used CIPCO's transmission system without authorization and compensation or benefitted from that allegedly wrongful use without compensating CIPCO. The appellees removed the suit to federal court, and CIPCO moved to remand the case to state court. The district court denied the remand motion, concluding that it had subject-matter jurisdiction over the suit because CIPCO's state law claims necessarily depended on the resolution of substantial and disputed issues of federal law. Thereafter, the district court granted the appellees' motion to dismiss because it concluded that CIPCO's state law claims were preempted by the Federal Power Act (FPA). CIPCO appeals both the denial of the motion to remand and the dismissal. We conclude that the district court erred by denying CIPCO's motion to remand, and we therefore reverse.

-2-

A. The Regulatory Backdrop

Due to the technical and complicated nature of this case, we begin by describing the general transformation from "the bad old days" of local monopolization of the electricity market, Midwest ISO Transmission Owners v. FERC, 373 F.3d 1361, 1363 (D.C. Cir. 2004), to the "brave new regulatory world" that provides the backdrop for this appeal, E. Ky. Power Co-op, Inc. v. FERC, 489 F.3d 1299, 1301 (D.C. Cir. 2007). We describe this transition in some detail at the outset because it is helpful to an understanding of the parties' relationships to each other, the parties' relationships to the Federal Energy Regulatory Commission (FERC), and the precise legal issues before this court.

In the not-so-distant past, single utilities generally controlled electricity generation, transmission, and distribution for a particular region and charged a combined or "bundled rate" for providing those services. The result was minimal competition among wholesale electricity providers. See New York v. FERC, 535 U.S. 1, 5 (2002) ("Competition among utilities was not prevalent."). As technology advanced, however, it became "possible for power companies to transmit electric energy over long distances at a low cost," id. at 7-8; as a result, robust nationwide competition in the bulk-power market–and lower costs for consumers–became more realistic. But without open, nondiscriminatory access to regional transmission facilities to deliver that power from generators to buyers, this potential competitive marketplace was largely unrealized.

In response to the anticompetitive effects of vertically integrated utility monopolies, in 1996 the FERC issued Order No. 888, fundamentally altering the wholesale electricity market. Order No. 888 "required public utilities to 'functionally unbundle' their wholesale generation and transmission services by stating separate rates for each service in a single tariff and offering transmission service under that

tariff on an open-access, non-discriminatory basis." Midwest ISO, 373 F.3d at 1364; see Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities, 61 Fed. Reg. 21,540, 21552 (FERC May 10, 1996) (hereinafter Order No. 888). As a result, wholesale energy generators gained open, non-discriminatory access to public utilities' transmission facilities at rates that the transmission providers are required to file with the FERC under Order No. 888.

In a further attempt to create a more efficient and competitive electricity market, the FERC encouraged utilities to cede control over their individual transmission facilities to one entity–a newly created regional transmission organization operated by an independent system operator (ISO). "As envisioned by FERC, an ISO would assume operational control–but not ownership–of the transmission facilities owned by its member utilities, thereby 'separating operation of the transmission grid and access to it from economic interests in generation.'" Midwest ISO, 373 F.3d at 1364 (quoting Order No. 888 at ¶ 31,654). The ISO then offers service over the regional transmission system at the rates set out in a single, grid-wide, open-access transmission tariff (OATT), which applies to all electricity generators seeking to use the regional transmission system to deliver power. See Regional Transmission Organizations, 65 Fed. Reg. 810, 811 (FERC Jan. 6, 2000) (Order No. 2000) (describing the benefits of regional transmission organizations). Under the FPA, the FERC is vested with exclusive jurisdiction to review the reasonableness of these regional transmission rates. See 16 U.S.C. §§ 824(b)(1), 824d(a), 824e(a); AEP Tex. N. Co. v. Tex. Indus. Energy Consumers, 473 F.3d 581, 584 (5th Cir. 2006) ("The Federal Power Act ('FPA') gives FERC exclusive jurisdiction to regulate the transmission and wholesale sale of electric energy in interstate commerce."), cert. denied, 128 S. Ct. 59 (2007).

Appellee Midwest Independent Transmission System Operator, Inc. (MISO) is one such ISO. MISO is a FERC-approved "public utility" that "link[s] up the

transmission lines of the member transmission-owning utilities . . . into a single interconnected grid stretching across the northern border of the U.S. from Michigan to eastern Montana, and reaching as far south as Kansas City, Missouri and Louisville, Kentucky." Midwest ISO, 373 F.3d at 1365. MISO exercises functional control over its members' facilities by calculating available transmission capability over the interconnected grid and by receiving, approving, and coordinating transmission-service requests for wheeling power over the grid. MISO members retain ownership of their individual transmission facilities and physically operate those facilities subject to MISO's overriding direction and functional control.

The change effected by this new regulatory regime was far-reaching and important, but not unlimited in scope. Under § 201(f) of the FPA, 16 U.S.C. § 824(f), governmental entities and electric cooperatives receiving financing under the Rural Electrification Act of 1936 are exempt from the FPA and by extension, are outside of the FERC's jurisdiction. These entities are considered non-public utilities for purposes of the FPA and are not required to file open-access transmission tariffs with the FERC. The FERC's rate and refund jurisdiction under §§ 205 and 206 of the FPA does not apply to non-public utilities. See Bonneville Power Admin. v. FERC, 422 F.3d 908, 918 (9th Cir. 2005) ("FERC's rate jurisdiction under § 205 and its refund jurisdiction under § 206 expressly apply *only* to public utilities." (emphasis added)), cert. denied, 128 S. Ct. 804 (2007). Appellant CIPCO is one such exempt non-public "non-jurisdictional" utility.

B. CIPCO, IPL, and the Operating and Transmission Agreement

CIPCO is a generation and transmission electrical power cooperative based in Cedar Rapids, Iowa. CIPCO owns power lines, substations, and related facilities that it uses to provide power and transmission service to its customers. Its transmission system is interconnected with the transmission system of Interstate Power & Light

(IPL), a subsidiary of Alliant Energy.[1]  This CIPCO-Alliant interconnected network is referred to as the Integrated Transmission System (ITS), and the central factual allegation in these proceedings is that CIPCO's elements of the ITS have been used without authorization and without compensation by MISO, RPGI, and its members.

In 1991, CIPCO and Iowa Electric Light and Power (Alliant's predecessor in interest) entered into an Operation and Transmission Agreement (O&T Agreement). The O&T Agreement governs CIPCO's and Alliant's operation, maintenance, and use of the ITS.  Under § 5.01 of the O&T Agreement, CIPCO and Alliant each maintain ownership of their own separate and discrete elements of the ITS, but pursuant to § 5.06 Alliant "provide[s] all management, supervision, operating supplies, services and labor for the operation of CIPCO's transmission facilities included in the [ITS]." (J.A. at 66.)  Under § 5.14 of the Agreement, both CIPCO and Alliant may use the ITS, including the other party's facilities, to wheel power for their own customers.  No wheeling charge is assessed for one party's use of the other party's facilities for this purpose.  In contrast, § 5.15 of the Agreement governs use of the ITS "for [the] Benefit[] of [Third-Party] Systems or [Third-Party] Electric Suppliers":

> In the event that either CIPCO or [Alliant] enter into an agreement with a non-party to this Agreement to wheel power for such non-party, or to serve customers of said non-party, thereby utilizing the Integrated Transmission System, the agreement with respect to such transaction shall be approved both by CIPCO and [Alliant].  Any monies paid to CIPCO or to [Alliant] for such services shall be shared by both in the same proportion as the basis for investment in transmission facilities described in section 5.17 hereof.

(J.A. at 71.)  Under § 5.17, Alliant is entitled to 69 percent of those revenues, leaving 31 percent for CIPCO.  The appellees imply throughout their briefs that the O&T Agreement establishes a rate for third-party use of the ITS pursuant to § 5.15 of the

_____

[1] For ease of reference, hereinafter IPL is referred to as Alliant.

Agreement. But no party directs us to any portion of the O&T Agreement identifying such a rate, and our reading of the O&T Agreement discloses no such rate. Moreover, during oral argument, appellee Resale Power Group of Iowa (RPGI) unequivocally stated that the O&T Agreement contains no such rate.

Because Alliant is a "public utility" under the Federal Power Act and subject to the jurisdiction of the FERC, 16 U.S.C. § 824(e), it is required to file a rate schedule with the FERC in an OATT (for those readers who are at this point suffering from acronym overload, OATT stands for "open access transmission tariff," ante p. 4, and should not be confused with the "O&T Agreement" discussed in this subsection B. and elsewhere in this opinion). See 16 U.S.C. § 824d(c). In 1994, well before the FERC issued Order No. 888, Alliant's predecessor in interest filed its rate schedule with the FERC and attached the O&T Agreement to its filing as an exhibit. Even though CIPCO is not a public utility under the FPA and is not subject to the FERC's jurisdiction, the O&T Agreement between the two parties was included because, in the words of Alliant's predecessor, even though "[s]ome of the[] [Agreement's] arrangements arguably do not involve jurisdictional services . . . [they] may have some impact on the ultimate pricing of jurisdictional services." (J.A. at 106.) The FERC accepted the O&T Agreement for filing. (J.A. at 350, FERC Letter Order, Docket No. ER94-247-000 (Aug. 11, 1994).)

C. MISO and the Transmission of Energy Across the ITS to RPGI Members

In November of 1999, Alliant joined MISO. Shortly thereafter, Alliant filed an application with the FERC seeking the FERC's approval to grant MISO functional control over many of its high-voltage transmission facilities, including Alliant's portion of the ITS. Notably, the application listed some CIPCO facilities as facilities whose functional control would be transferred to MISO under the transaction. In response, CIPCO intervened and objected to the attempted transfer of control over its facilities to MISO. In March of 2000, the FERC approved Alliant's application, but only insofar as Alliant transferred control over its own facilities to MISO. See Alliant

Energy Corporate Servs., Inc., 90 FERC ¶ 61,344, 62,134 (Mar. 31, 2000) ("In this order we are only approving the transfer to the [MISO] of the facilities that Alliant Energy actually owns."); see also Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc., 110 FERC ¶ 61,093, 61,392 (Feb. 7, 2005) ("[I]n Alliant, the Commission emphasized that it was authorizing the transfer of only the jurisdictional facilities that Alliant owned."). Accordingly, MISO now functionally controls transmission service over and on Alliant's transmission system. Because MISO controls the Alliant transmission facilities that are interconnected with CIPCO's facilities in the ITS, MISO allegedly causes electricity to flow over CIPCO's transmission system without authority from CIPCO and without compensating CIPCO for the use of CIPCO's lines and related facilities to serve members of RPGI.

In addition to transferring functional control of its transmission facilities (but not CIPCO's) to MISO, in January of 2002, Alliant also assigned some of its transmission-service agreements to MISO. Alliant assigned to MISO a 1998 agreement that it had entered into with MidAmerican Energy Company (MidAmerican), a wholesale power supplier. The 1998 agreement (forged before Alliant joined MISO) required Alliant to provide transmission service to MidAmerican from January 1, 1999 to December 31, 2003. MidAmerican had entered into the agreement with Alliant in order to deliver power to the members of RPGI, which are small Iowa cities and the small electric utilities owned by Iowa municipalities located across the state. From January of 1999 to January of 2002, before the 2002 assignment of the Alliant-MidAmerican agreement to MISO occurred, Alliant had fulfilled its obligation under the agreement with MidAmerican by using CIPCO's transmission system within the ITS to deliver energy from MidAmerican to the RPGI members. After the assignment, from January of 2002 to the end of 2003, MISO took over Alliant's obligation and allegedly used CIPCO's system within the ITS to transmit energy from MidAmerican to the RPGI members.

In January of 2004, RPGI discontinued its supply agreement with MidAmerican and agreed to purchase wholesale power for its members from a subsidiary of the Ameren Corporation. Eventually, RPGI came to an independent agreement with MISO for transmission of the power it was now purchasing from Ameren. Pursuant to these agreements, MISO delivered energy from Ameren–allegedly using the ITS and CIPCO's system–to RPGI members from January 1, 2004, to January 1, 2005. In sum, CIPCO alleges that all of the energy that RPGI purchased from either MidAmerican or Ameren has been delivered to the RPGI members over the ITS, using CIPCO's elements of the ITS to accomplish the delivery.

After RPGI elected to change power suppliers from MidAmerican to Ameren, CIPCO began challenging the delivery of electricity over its facilities within the ITS. At this stage of the instant litigation, the record before us does not indicate that CIPCO objected to the same service prior to the change of suppliers from MidAmerican to Ameren, or that CIPCO was being compensated for this service. Nevertheless, CIPCO asserts that the delivery of power to RPGI members necessarily utilized CIPCO's facilities and that CIPCO was not being compensated for the use of its transmission system.

### D. Proceedings before the FERC and the District Court

In August of 2004 (after RPGI changed power suppliers from MidAmerican to Ameren), CIPCO filed a complaint with the FERC under § 206 of the FPA, 16 U.S.C. § 824e, which gives the FERC the authority to review the reasonableness of public-utility rates for transmissions or sales subject to its jurisdiction. CIPCO alleged that MISO had failed to pay for MISO's use of CIPCO's transmission system in violation of MISO's own OATT, and CIPCO requested that the FERC require MISO to include a separate charge for the use of CIPCO facilities within MISO's OATT. Alternatively, CIPCO requested that the FERC "state that nothing in its order permits [MISO] to use [CIPCO's] facilities." Cent. Iowa Power Coop., 110 FERC at ¶ 61,389. After notice of the administrative complaint was published, Alliant intervened in support of CIPCO, and RPGI intervened in support of MISO.

-9-

In an order issued in February of 2005, the FERC concluded that because CIPCO is not a regulated public utility under the FPA, the FERC does not have jurisdiction over CIPCO's provision of transmission service and is consequently without authority to regulate CIPCO's rates. The FERC rejected CIPCO's request for relief, but explained that:

> [I]f the parties were to agree on (or a court with jurisdiction were to determine) a charge to be paid by [MISO] or [Alliant] and then reflected in a jurisdictional rate, then the jurisdictional entity, whether it be [Alliant] or [MISO], could file the proposed charge with [FERC]. [FERC] has previously held that, if [CIPCO] believes that its arrangements with [Alliant] do not properly account for the use of [the ITS] and for sharing of revenues from third-party uses, [CIPCO] may file a complaint under section 206 of the FPA to modify [its] arrangements, i.e., to modify the O&T Agreement.

Id. at ¶ 61,392 (footnote omitted). And while the FERC denied CIPCO's request for relief, it made clear that "nothing in [its] order should be construed as a determination that [MISO] may use [CIPCO's] facilities without compensation." Id. at ¶ 61,393.

CIPCO then filed a request for rehearing and for clarification of the record. The FERC denied the request for rehearing and clarified its prior order in part. It again rejected CIPCO's argument that MISO was the jurisdictional provider of the transmission service at issue. Rather, the FERC determined that "the service at issue is transmission service over [CIPCO's] facilities." Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc., 113 FERC ¶ 61,116, 61,427 (Nov. 1, 2005). The FERC also explained that "[CIPCO] attaches unwarranted reliance on the fact that the O&T Agreement is on file with the Commission. [CIPCO] was not the entity to file the O&T Agreement with the Commission. The O&T Agreement is jurisdictional with respect to the service provided thereunder by [Alliant], the jurisdictional public utility that filed it." Id. (footnote omitted).

-10-

In March of 2006, CIPCO filed a petition against MISO, RPGI, and RPGI members in Iowa state court, asserting theories of breach of an implied-in-fact contract, unjust enrichment, trespass, and conversion. The appellees removed the case to federal court, and CIPCO moved to remand the case to state court. The district court denied the motion to remand, concluding that the adjudication of CIPCO's state law claims necessarily depended on the resolution of disputed and substantial federal issues. While the motion to remand was pending, MISO and RPGI moved to dismiss CIPCO's claims, arguing that the claims were preempted by the FPA. The district court granted the motion. This appeal follows.

## II.

First, we address CIPCO's argument that the district court erred by denying its motion to remand. We review the district court's exercise of removal jurisdiction and its denial of a motion to remand *de novo*. Phipps v. FDIC, 417 F.3d 1006, 1010 (8th Cir. 2005). Defendants may remove civil actions to federal court only if the claims could have been originally filed in federal court. See 28 U.S.C. § 1441(b); Gore v. Trans World Airlines, 210 F.3d 944, 948 (8th Cir. 2000). Here, the appellees sought to remove CIPCO's suit on the basis of federal-question jurisdiction. Critically, the party seeking removal has the burden to establish federal subject matter jurisdiction, Green v. Ameritrade, Inc., 279 F.3d 590, 596 (8th Cir. 2002); all doubts about federal jurisdiction must be resolved in favor of remand, Dahl v. R.J. Reynolds Tobacco Co., 478 F.3d 965, 968 (8th Cir. 2007).

Removal based on "federal-question jurisdiction is governed by the 'well-pleaded-complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987). Because this well-pleaded complaint rule "makes the plaintiff the master of the claim[, the plaintiff]

-11-

may avoid federal jurisdiction by exclusive reliance on state law." Id. Defendants are "not permitted to inject a federal question into an otherwise state-law claim and thereby transform the action into one arising under federal law." Gore, 210 F.3d at 948. It is firmly established that a federal defense, including a preemption defense, does not provide a basis for removal, "even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue in the case." Caterpillar, 482 U.S. at 393.

"There is, however, another longstanding, if less frequently encountered, variety of federal 'arising under' jurisdiction, [the Supreme Court] having recognized for nearly 100 years that in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 312 (2005). There is no "single, precise, all-embracing test for jurisdiction over federal issues embedded in state-law claims between nondiverse parties." Id. at 314 (internal marks omitted). To determine whether a case fits "within th[is] special and small category," Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 699 (2006), "the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." Grable, 545 U.S. at 314.

Here, CIPCO's state court petition does not present a federal issue on its face. But as the preceding legal authority makes clear, CIPCO's "characterization of [its] claim[s] . . . is not dispositive of whether federal question jurisdiction exists." Peters v. Union Pac. R.R. Co., 80 F.3d 257, 260 (8th Cir. 1996). If CIPCO's right to relief necessarily depends on the resolution of a disputed and substantial question of federal law, then the district court correctly denied CIPCO's motion to remand. Grable, 545 U.S. at 314.

In denying CIPCO's motion to remand, the district court concluded that "[a]ll of the [state] claims advanced by CIPCO are necessarily based on federal law" for two reasons. (CIPCO's Add. at 47.) The appellees adopt much of the same reasoning in their briefs. We address each reason in turn.

### A. The O&T Agreement

First, the district court concluded that CIPCO's state law claims are based on federal law because they necessarily depend on the resolution of whether the O&T Agreement was violated. We agree with the district court and the appellees that generally the O&T Agreement has the same legal force as a federal regulation because it is part of a FERC-filed tariff. See 18 C.F.R. § 35.2(b) n.1 (defining a "tariff" as "a compilation . . . of rate schedules of a particular public utility"); id. § 35.2(b) (defining a "[r]ate schedule" as including a statement of "rates and charges for or in connection with [electric] service," and "all classifications, practices, rules, regulations or contracts *which in any manner affect or relate to* [such] service, rates, and charges" (emphasis added)); see also Bryan v. BellSouth Commc'ns, Inc., 377 F.3d 424, 429 (4th Cir. 2004) ("[A] filed tariff carries the force of federal law."), cert. denied, 543 U.S. 1187 (2005). But we do not agree that the mere fact that the O&T Agreement is listed as a grandfathered agreement under an attachment to the MISO OATT converts every legal dispute implicating the O&T Agreement into one over which the FERC exercises exclusive jurisdiction. See In re Mirant Corp., 378 F.3d 511, 519 (5th Cir. 2004) (recognizing that the FPA preempts breach-of-contract claims that challenge FERC-filed rates, but also observing that "the FPA does not provide FERC with exclusive jurisdiction over the breach of a FERC approved contract" to the extent the claimed breach does not challenge the filed rate). If CIPCO must prove a violation of the O&T Agreement to recover under its state law claims, and if proving that violation challenges FERC-filed rates, then those claims would raise a federal issue.

But as we explain below, CIPCO need not establish a violation of the O&T Agreement to succeed in proving its state law claims. As an initial matter, it is unclear

-13-

how CIPCO could demonstrate that the appellees violated the O&T Agreement given that only CIPCO and Alliant are parties to the Agreement.[2]  Even though the O&T Agreement is on file with the FERC, there is no indication in the record that Alliant assigned all of its rights and obligations under the O&T Agreement to MISO, specifically those related to Alliant's management of CIPCO's portion of the ITS, when it transferred functional control of <u>its</u> facilities (but not CIPCO's) as well as certain operating agreements to MISO.  The appellees conceded at oral argument that MISO, RPGI, and its members are not parties to the O&T Agreement, a private contract, and MISO also clearly agreed that it is not an assignee of Alliant under the O&T Agreement.

Notwithstanding their non-party status under the O&T Agreement, the appellees maintain that the O&T Agreement is "relevant" and "central" to CIPCO's state claims. (MISO's Br. at 23; RPGI's Br. at 26.)  But relevance is not the operative question here, where no federal question is alleged on the face of CIPCO's state court petition. Rather, the question is whether CIPCO's state law claims necessarily depend on a showing that the O&T Agreement was violated in such a way as to implicate the FERC-filed rates.  This inquiry demands precision; if the appellees' argument is correct, they should be able to point to the specific elements of CIPCO's state law claims that require proof that the O&T Agreement was violated and explain why that proof is necessary.  See <u>Grable</u>, 545 U.S. at 315 (concluding that "[w]hether Grable was given notice within the meaning of the federal statute [was] an essential element of its quiet title claim").  Illustratively, none of the appellees even discuss the elements of CIPCO's state law claims in any detail.

_____

[2] If the appellees' argument is, instead, that CIPCO must prove that Alliant violated the O&T Agreement to succeed on its claims against the appellees, we also find this position untenable.  If CIPCO ultimately succeeds on its state law claims, the implication may be that Alliant has breached the O&T Agreement with CIPCO.  But CIPCO need not prove that Alliant violated the Agreement to prove the elements of its claims *against the appellees*; at the end of the day, it is possible that one or more of the appellees will be liable to CIPCO, and Alliant will be found to have complied with the O&T Agreement.

Our review of the nature and elements of CIPCO's state law implied contract and tort claims convinces us that adjudication of those claims does not require CIPCO to prove a violation of the O&T Agreement. Any right CIPCO has to damages for breach of an implied-in-fact contract under Iowa law is independent of its express contractual right to compensation for third-party use under the O&T Agreement vis-a-vis Alliant. See Roger's Backhoe Serv., Inc. v. Nichols, 681 N.W.2d 647, 651 (Iowa 2004) (describing the showing required to make out an implied-in-fact contract claim and relying on the Restatement (Second) of Contracts § 69). And because it is clear and undisputed that none of the appellees are parties to or assignees of the O&T Agreement, a court is not required to determine whether the O&T Agreement was violated to adjudicate CIPCO's unjust-enrichment claim. State ex rel. Palmer v. Unisys Corp., 637 N.W.2d 142, 154-55 (Iowa 2001) (describing the showing required to recover under the theory of unjust enrichment). In sum, we are unconvinced that CIPCO's *implied* contract claims against the appellees require CIPCO to prove that the appellees violated an *express* contract that none of the appellees are a party to; in our view, CIPCO can succeed on its claims independent of the O&T Agreement. See Dixon v. Coburg Dairy, Inc., 369 F.3d 811, 817 (4th Cir. 2004) (en banc) ("[I]f the plaintiff can support his claim with even one theory that does not call for an interpretation of federal law, his claim does not 'arise under' federal law for purposes of § 1331.").

Likewise, none of CIPCO's tort claims require interpretation of the O&T Agreement. See Restatement (Second) of Torts §§ 158, 217 (describing the elements of a trespass-to-real-property and trespass-to-chattel claim); Nichols v. City of Evansdale, 687 N.W.2d 562, 572-73 (Iowa 2004); (applying the Restatement to an Iowa trespass claim); Condon Auto Sales & Serv., Inc. v. Crick, 604 N.W.2d 587, 593 (Iowa 1999) (describing the elements of conversion). The O&T Agreement has no bearing on whether any of the appellees wrongfully dispossessed CIPCO of its property under any of the three state law tort claims because none of the appellees

-15-

were an original party to the Agreement. Further, none are assignees of Alliant, without which, they can gain no possessory interest to CIPCO's system pursuant to the O&T Agreement.

Moreover, insofar as the state court may have occasion to consider the O&T Agreement in adjudicating CIPCO's state law claims, we do not think that the state court's consideration of the two-party Agreement disturbs the "congressionally approved balance of federal and state judicial responsibilities," Grable, 545 U.S. at 314; we are confident in the adjudicating state court's ability to analyze the plain language of the private contract–a bread-and-butter state court issue, see Empire Healthchoice Assurance, Inc., 547 U.S. at 701 (concluding that the respondent's "fact-bound . . . , situation-specific," and "nonstatutory" state-law reimbursement claim could not "be squeezed into the slim category Grable exemplifies," and noting that "[t]he state court in which the personal-injury suit was lodged is competent to apply federal law").

We recognize that CIPCO's state court petition makes several references to the O&T Agreement–references that, when read in isolation, tend to support the conclusion that CIPCO itself has made its state law claims dependent on showing a violation of the O&T Agreement. But after reviewing the state court petition in its entirety, and considering the legal theories relied on by CIPCO, we think that the petition's references to the O&T Agreement are best construed as important factual background. Nowhere in the petition does CIPCO make a violation of the O&T Agreement–an express contract–the legal basis for its implied-contract and tort claims. CIPCO's references to the O&T Agreement in its state court petition do not raise a federal question sufficient to establish federal jurisdiction in the federal district court.

### B. The MISO OATT

The district court also concluded that CIPCO's state law claims necessarily require the resolution of a substantial federal question because CIPCO's state law

-16-

claims implicate MISO's FERC filed and regulated OATT. According to the district court:

> CIPCO's claims are founded on [MISO's] refusal to pay a rate that is anything but the rate that is set forth in the [MISO] OATT. The conduct that CIPCO seeks to condemn or the lawfulness of [MISO's] conduct is wholly governed by the [MISO] OATT. Because [MISO's] duties or obligations arise under the [MISO] OATT, any claim asserting that CIPCO is entitled to a rate that is not provided by the [MISO] OATT is necessarily based on an assumed violation of the [MISO] OATT. CIPCO's action turns entirely upon [MISO's] compliance with a federal regulation; absent a violation of the [MISO] OATT, no state-law liability could survive. . . .
>
> . . . CIPCO essentially asks the court to conclude that CIPCO is entitled to a rate that is not included in, and is in addition to, the current rate that [Alliant] developed for third party use of the ITS. CIPCO's right to relief requires the court to determine a hypothetical reasonable rate for the transmission service that [MISO] provided over the ITS, which includes CIPCO's facilities. . . . Such a determination must be made by FERC.

(CIPCO's Add. at 47-48.)

We understand the district court's reasoning to be that because the scope of the MISO OATT extends to the use of CIPCO's system in the form of third-party rates for the use of the entire ITS, CIPCO's state law claims seeking compensation for that use implicitly challenge the reasonableness of those FERC-approved rates. Claims that require a court to second-guess the reasonableness of FERC-filed rates require the resolution of a substantial federal question. See Bryan, 377 F.3d at 432 (concluding that the plaintiff's state law claim necessarily raised a substantial question of federal law because it would authorize a court to award damages and effectively alter a filed rate dictated by a federally filed tariff). On the other hand, if the MISO OATT does not cover service over CIPCO's lines, then it is clear that the adjudication of CIPCO's

state law claims, and the determination of damages for the use of CIPCO's system, would not undermine or implicate the FERC's rate-making authority in any way. See Fax Telecommunicaciones Inc. v. AT&T, 138 F.3d 479, 487 (2d Cir. 1998) (finding no federal question jurisdiction over the plaintiff's breach-of-contract claim where the basis for the claim was "independent of the rate on file with the FCC" ); cf. In re NOS Commc'ns, 495 F.3d 1052, 1060 (9th Cir. 2007) ("[I]nsofar as [the state-claim plaintiffs] can prove damages that do not refer to the filed-rate, its state law claims may proceed."). The analysis we must undertake to ascertain whether the scope of MISO's OATT covers the use of CIPCO's transmission system is akin to the analysis required to apply the filed rate doctrine. See Bryan, 377 F.3d at 430 n.8 (observing that while the filed rate doctrine is not "coterminous with the scope of federal question jurisdiction . . . [i]n certain circumstances . . . the inquiries merge"); see also Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc., 524 U.S. 214, 229 (1998) (Rehnquist, C.J., concurring) (explaining that because "[t]he tariff does not govern . . . the entirety of the relationship between the common carrier and its customers" the filed rate doctrine "need pre-empt only those suits that seek to alter the terms and conditions provided for in the tariff"); Iowa Network Servs., Inc. v. Qwest Corp., 466 F.3d 1091, 1097 (8th Cir. 2006) (rejecting a claim that the filed rate doctrine precluded a state utility board from determining whether a filed tariff applied to a particular type of traffic).

The scope of the MISO OATT and the provisions of MISO's service agreements with Ameren and RPGI are important to our jurisdictional analysis. But we cannot tell from the record whether the MISO OATT or the relevant service agreements account for service over CIPCO's transmission system. And the parties do little to clarify the issue. CIPCO contends that because CIPCO's transmission system was not transferred to MISO's functional control, and because MISO has no authority to provide service over transmission facilities that have not been transferred to its functional control, MISO's OATT and the applicable service agreements do not account for the use of CIPCO's system. We also note that in a letter in the record, Alliant represents–albeit after the initiation of this dispute–that "Alliant's zonal rate

under the [MISO] OATT does *not* include the costs of CIPCO's facilities, but only recovers the costs of [Alliant's] facilities. No CIPCO revenue requirements are included in the computation of the [Alliant] zonal rate under the [MISO] OATT." (J.A. at 285.)

The appellees disagree, but do so with ambiguity. MISO recognizes that under the MISO OATT and the MISO Transmission Owners Agreement by which it is bound, MISO is without authority to provide transmission service over facilities that have not been transferred to MISO's functional control.[3] On the one hand, MISO agrees both that CIPCO's system has not been transferred to MISO and that the service agreements by which MISO transmits energy to RPGI and its members "contemplate no compensation for CIPCO." (MISO's Br. at 25.) On the other hand, MISO also disputes that it has engaged in the unauthorized use of CIPCO's system. Despite these representations, MISO obliquely suggests that CIPCO's state law claims implicate MISO's OATT and its service agreements with Ameren and RPGI. Nowhere,

---

[3] In its answer to the administrative complaint that CIPCO filed with the FERC, which is included in the parties' joint appendix, MISO observed "that the authorization granted to [MISO] by the Transmission Owners is limited to the following three purposes: (i) providing non-discriminatory open access transmission service over the Transmission System to transmission customers, including Owners; (ii) receiving funds associated with transmission services from transmission customers *solely as agent for the owners or their designee(s) and distributing such funds to the Owners or their designee(s)*; and (iii) being responsible for regional system security." (J.A. at 443 (internal marks omitted).) According to MISO's representations in its answer, "[t]his language makes it clear [MISO] may only provide service over the 'Transmission System,' i.e., the transmission facilities that the Transmission Owners committed to its functional control and that it can only receive funds from transmission customers as agent for the Owners and may distribute them only to the Owners." (Id.) We remember, on this point, that Alliant was permitted by the FERC to transfer operational control only of Alliant's elements of the ITS to MISO, and not CIPCO's elements. In the same filing, MISO observed that "[it] could be in breach of its duties to its Transmission Owners if it were to engage in collecting and distributing CIPCO revenues." (Id. at 428.)

however, do we understand MISO clearly to take the position that its OATT incorporates a rate for third-party use of the entire ITS. Somewhat more clearly, RPGI contends that CIPCO gave Alliant "the exclusive authority to sell service over the [ITS] to third parties, [and] [p]ursuant to that authority, [Alliant] has developed a rate for use of the [ITS], and has filed that rate (now as part of the MISO's filed tariff) at FERC." (RPGI's Br. at 36.) We find that assertion difficult to square with § 5.15 of the O&T Agreement, ante p.6, which gives both Alliant and CIPCO the right to enter into agreements with third parties to wheel power over the ITS, subject to the express approval of the other.

Neither CIPCO nor the appellees direct us to the legally operative language in the MISO OATT or in the relevant service agreements demonstrating the scope of the OATT and the inclusion of service over CIPCO's system within the rates set out in the MISO OATT. While CIPCO's omission in this regard may be understandable (because most parties will be hard pressed to demonstrate what they claim to be absent from the record), the appellees' reliance on largely unsupported representations–particularly in the complex context of this case–is not. We are unable to invoke federal-question jurisdiction based on the appellees' less than adequately supported say so alone.

Not only have the appellees failed to convince us that CIPCO's state law claims challenge rates approved by the FERC in MISO's OATT–a showing that would make this case more difficult[4]–the FERC's orders denying CIPCO relief do not support the

_____

[4] Our decision should not be read to imply that if the scope of MISO's OATT and the rates therein do account for the use of CIPCO's system, the filed rate doctrine automatically bars CIPCO's state law claims. We do not decide the resulting thorny filed rate doctrine question of whether MISO's FERC-filed rate bars CIPCO's state law challenge to a portion of that rate even though CIPCO: is a non-public utility; did not join MISO; allegedly did not give MISO authorization to wheel power over its system; and allegedly did not agree to a rate for the use of its non-jurisdictional non-public utility system.

-20-

district court's conclusion that CIPCO's state law claims necessarily raise a substantial federal question. As the FERC observed, CIPCO has no legal relationship with MISO, having never joined MISO. And contrary to the district court's characterization of the transmission service at issue in this litigation, the FERC "reject[ed] [CIPCO's] argument that [MISO] is the jurisdictional provider of the alleged transmission service at issue." Cent. Iowa Power Coop., 113 FERC at ¶ 61,427. According to the FERC, "the alleged service in question is non-jurisdictional . . . and is not jurisdictional service by [MISO]. Thus, [CIPCO's] . . . arguments concerning the applicability of various provisions of the [MISO] OATT are rejected." (Id. at 409.) As we understand the FERC's orders, it concluded that the MISO OATT is not implicated by the non-jurisdictional service at issue because the disputed service was provided by CIPCO, a non-jurisdictional provider, rather than by MISO. Nowhere in its orders did the FERC suggest that to redress its grievance, CIPCO could seek review of the reasonableness of MISO's existing rates or agreements; instead, the FERC indicated that "[i]f the parties were to agree on (or a court with jurisdiction were to determine) a charge to be paid by [MISO] or [Alliant] and then reflected in a jurisdictional rate, then the jurisdictional entity . . . could file the proposed charge with [the FERC]." Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc., 110 FERC at ¶ 61,392. Contrary to RPGI's assertion at oral argument, we do not read the term "parties" as used in the FERC order to be restricted to only CIPCO and Alliant, but to also include MISO as one of the parties to the FERC proceeding. The implication of this language is that CIPCO's system is not reflected in an existing jurisdictional rate.

We conclude that the FERC's conclusions are sound and consistent with the FPA,[5] which bases the "FERC's authority . . . on the identities of the [service providers], rather than the nature of the transactions." Transmission Agency of N. Cal. v. FERC, 495 F.3d 663, 674 (D.C. Cir. 2007). "FERC's rate jurisdiction under

---

[5] Our decision should in no way be construed as a collateral review of the FERC's decisions rejecting CIPCO's request for relief. We recite them only for the impact they have on the present posture of this litigation.

§ 205 . . . expressly appl[ies] only to public utilities." Bonneville Power Admin., 422 F.3d at 918. Contrary to the district court's conclusion that the FERC must calculate a reasonable rate for the use of CIPCO's transmission system, CIPCO is expressly exempted from the FERC's jurisdiction under 16 U.S.C. § 824(f). Accordingly, a state court's calculation of quasi contract or tort damages for the use of CIPCO's transmission facilities does not directly implicate the FERC's rate-making authority. That CIPCO may be awarded damages potentially in the form of a rate that is not included in the MISO OATT is, we think, the inevitable consequence of the stark jurisdictional boundary that the FPA draws between public utilities and non-public utilities.

We recognize that the FERC has the authority to review the rates of non-jurisdictional transmission-service providers insofar as those rates affect the rates of jurisdictional providers. Section 206 of the FPA, 16 U.S.C. § 824e(a), grants the FERC authority to consider "any rule, regulation, practice, or contract affecting" the rate of a "public utility." Pursuant to this statutory authority, the "FERC may analyze and consider the rates of non-jurisdictional utilities to the extent that those rates affect jurisdictional transactions," in effect "a form of indirect regulation" of the rates of non-jurisdictional utilities. Pac. Gas & Elec. Co. v. FERC, 306 F.3d 1112, 1114, 1116 (D.C. Cir. 2002). As described by the D.C. Circuit in the context of a non-jurisdictional utility voluntarily participating in a FERC-jurisdictional ISO, the rate of the non-jurisdictional utility "can be conceptualized not as its own rate but rather as a cost of the [regional] ISO" that must be reviewed as a part of the FERC's ultimate evaluation of whether the jurisdictional ISO's rates are just and reasonable. Id. at 1116-17. Here, however, CIPCO has not voluntarily joined MISO.

Further, in this context, we do not think that this "indirect regulatory" authority is a sufficient basis for concluding that a state court's potential calculation of CIPCO's damages constitutes a federal issue. It is not clear that such a determination would affect MISO's future rates in any way. As MISO and RPGI acknowledge, if the state

court adjudicating CIPCO's state claims orders MISO to pay for the cost of its prior use of CIPCO's transmission system, it is not clear that MISO may simply pass this cost on in the form of an increased future rate. "The . . . rule against retroactive ratemaking prohibits [the FERC] from adjusting current rates to make up for a utility's over- or under-collection in prior periods." Consol. Edison Co. of N.Y., Inc. v. FERC, 347 F.3d 964, 969 (D.C. Cir. 2003) (internal marks omitted). It is possible that the calculation of a reasonable sum for service over CIPCO's lines will affect MISO's rate for future transmission service over CIPCO's lines if the parties take the necessary steps to carry out a prospective rate change by incorporating CIPCO's entitlement to revenue, as determined by the state court or by agreement, into MISO's rate after the completion of this litigation. See Transmission Agency of N. Cal., 495 F.3d at 671 ("*[O]nce Vernon becomes a [participating transmission owner]*, its [transmission revenue requirement] becomes a component of the rate design under which CAIRO operates." (emphasis added)). But this is not MISO's only option for dealing with the consequences of CIPCO's assumed successful prosecution of its claims. It is also possible that RPGI will find it necessary to contract with CIPCO directly for transmission service from the point at which MISO's tariffed service leaves off and CIPCO's begins, a contract that would be totally independent of MISO's OATT.

We decline to find the required federal question here based on the possibility that the adjudicating court's calculation of damages will have some effect on a jurisdictional utility's future, yet-to-be-formulated rate. The FERC's limited authority to review the rates of non-jurisdictional utilities does not transform every adjudication implicating a non-jurisdictional utility's rate, "rule, regulation, practice or contract," 16 U.S.C. § 824e(a), into a federal question simply because that decision may at some point in the future affect the rates of a jurisdictional utility, cf. Gulf States Utils. Co. v. Ala. Power Co., 824 F.2d 1465, 1472 n.9 (5th Cir. 1987) (recognizing that, if successful, the plaintiff's fraudulent contract claims "would affect the filed rates by eliminating them," but concluding that Congress did not intend "through the FPA to preempt such indirect effects"). In our view, so concluding would improperly blur the

jurisdictional boundary created by Congress that prevents the FERC from regulating the rates of non-public utilities.

After careful consideration of the parties' briefs, their oral arguments, and the record, we conclude that the appellees have not met their burden to demonstrate that CIPCO's implied-contract and tort claims implicate the MISO OATT or the MISO service agreements by which MISO transmits power to the RPGI members. See California ex rel. Lockyer v. Dynegy, Inc., 375 F.3d 831, 838 (9th Cir. 2004) ("[T]he burden of establishing federal jurisdiction falls to the party invoking the statute."), cert. denied, 544 U.S. 974 (2005); see also Kytel Int'l Group, Inc. v. Rent-A-Center, Inc., 43 Fed. Appx. 420, 423-24 (2d Cir. 2002) (unpublished) (remanding because it was unclear whether the plaintiff's state law claim was "independent of any rates on file with the FCC," and directing the district court to remand the case to state court if it could not make this determination from the record). Nothing in this opinion should be construed as expressing any opinion on the merits of CIPCO's state law claims.

## III.

For the reasons described above, we conclude that the adjudication of CIPCO's state law claims does not necessarily depend on the resolution of a substantial question of federal law. Lacking federal question jurisdiction, the district court erred by denying CIPCO's motion to remand. Because we conclude that the district court erred by denying the motion to remand, we do not reach CIPCO's challenge to the district court's dismissal of the suit on preemption grounds. See Vincent v. Dakota, Minn. & E. R.R. Corp., 200 F.3d 580, 582 (8th Cir. 2000) ("[B]ecause the district court remanded for a lack of subject matter jurisdiction, it lacked jurisdiction to make any substantive rulings, and thus, no rulings of the federal court have any preclusive effect on the substantive matters before the state court." (internal marks omitted)); see also Caterpillar, 482 U.S. at 399 n.13 (declining to reach the defendant's preemption arguments where the case was properly remanded for lack of federal jurisdiction).

The district court's judgment is reversed, and the case is remanded to the district court with directions to remand the case to the Iowa District Court in and for Linn County, the court from which it was wrongfully removed.

_____