Filed 2/5/25  Carson Hybrid Energy Storage v. Turlock Irrigation District CA5
Opinion following Rehearing

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CARSON HYBRID ENERGY STORAGE, LLC., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> TURLOCK IRRIGATION DISTRICT, et al., <br><br> Defendants and Respondents. | F087073 <br><br> (Super. Ct. No. CV-23-001227) <br><br><br> **OPINION** |

APPEAL from an order of the Superior Court of Stanislaus County.  Sonny S. Sandhu, Judge.

Duran and Cedillo and Manuel Duran for Plaintiffs and Appellants.

Duncan and Allen and Jon R. Stickman for Defendants and Respondents.

-ooOoo-

Plaintiffs Carson Hybrid Energy Storage, LLC and CMD Carson, LLC (collectively "Carson") appeal the trial court's order dismissing Carson's complaint with prejudice after the court sustained defendant Turlock Irrigation District's ("Turlock") demurrer.  The court found that Carson's complaint was preempted due to ongoing administrative proceedings before the Federal Energy Regulatory Commission (FERC) under the Federal Power Act (FPA).  (See 16 U.S.C. §§ 824 et seq.)

We originally filed an opinion reversing the judgment. However, we granted Turlock's petition for rehearing to consider the impact of new proceedings before FERC that occurred while this appeal was pending. We reaffirm our earlier decision and reverse the judgment.

## BACKGROUND

### Carson's Complaint

On March 9, 2023, Carson filed a complaint in Stanislaus County alleging, in relevant part, the following:

Turlock operates as a public corporation that provides electricity services to ratepayers and other utilities. Relevant here, Turlock provides "non-discriminatory transmission access" to other utilities, meaning Turlock "awards interconnection requests and transmission services on a first come first serve equal basis, without regard to project owner." Carson, a private company, needed to interconnect a future energy storage project with Turlock's transmission system to sell energy to the electrical grid.

On January 7, 2021, the parties entered into an Interconnection System Impact Study Agreement (ISISA). In return for Carson's deposit and funding, Turlock would issue a report consistent with the ISISA's parameters within six to nine months detailing the projected impact of Carson's project on Turlock's system, estimating Carson's costs to upgrade any necessary equipment to secure interconnection, and projecting the time to complete interconnection. Beyond Carson's deposit, Turlock would invoice Carson for any necessary work, provide those invoices to Carson, and reconcile any discrepancies upon the report's completion.

Turlock also placed Carson's project in its interconnection queue. Turlock informed Carson only one project preceded Carson's project, but Carson later came to believe that Turlock impermissibly placed its own competing energy storage project ahead of Carson's project in the queue.

2.

Over the next two years, various disputes regarding the ISISA arose forming the basis for Carson's allegations that Turlock breached the ISISA by: (1) failing to utilize the correct modeling parameters specified in the ISISA; (2) utilizing modeling parameters not provided in the ISISA; (3) failing to provide analysis and models required by the ISISA; (4) failing to provide information required by Section 5.0 of the ISISA; (5) impermissibly delaying the interconnection study for various improper reasons; (6) refusing to provide invoices; (7) refusing to permit Carson to arrange relationships with third-party vendors pursuant to Section 7.1 of the ISISA; (8) failing to communicate with the California Independent System Operator (CAISO) as required by Attachment A to the ISISA; and (9) threatening to withdraw Carson's interconnection request unless Carson provided an additional $150,000 within 30 days for Turlock to proceed with the next study, the Interconnection Facilities Study (IFS), where Turlock has not, according to Carson, completed the first study under the ISISA.

Carson requested that the trial court award injunctive relief to prevent Turlock from (1) enforcing the deadline to fund the $150,000 for the IFS until Turlock completes the deficient ISISA report, (2) removing Carson's project from the interconnection queue, and (3) considering its own competing project before Carson's project. Carson also requested that the court order Turlock to specifically perform the obligations Carson contended Turlock failed to perform.

### FERC Proceedings

On February 10, 2023, plaintiff CMD Carson, LLC (CMD) filed an application with the FERC under sections 210 and 211 (16 U.S.C. §§ 824i, 824j) of the FPA for an order directing Turlock to provide interconnection and transmission services for Carson's project. The factual allegations in CMD's application were substantially the same as

3.

those in its complaint.[1]  However, CMD did not request that FERC issue the relief requested in Carson's complaint.

Turlock filed, in relevant part, a protest and motion to hold the FERC proceedings in abeyance pending the completion of the study process, upgrades, and new facilities. Turlock argued that ordering interconnection prior to the completion of the above would not meet the "requirements of sections 210, 211, 212, and 213 of the FPA and section 2.20 of the Commission's Regulations."  Turlock further argued a premature order would "jeopardize [the] reliability of Turlock's system and compel ratepayers to subsidize provision of service to [CMD] because Turlock would have to pay for upgrades to avoid exposing its system to reliability risks."  Finally, Turlock contended that, absent the agreements required for the full study and interconnection process, Turlock could not ensure the project would conform to Turlock's operating criteria, and, without an IRS Private Letter Ruling, "would jeopardize the tax-exempt status of the bonds that Turlock used to finance its transmission system."

With respect to Turlock's request for abeyance, CMD argued that all issues need not be resolved prior to a preliminary order requiring interconnection.  CMD admitted it was "willing to agree to and pay for further studies, but Carson would like those agreements to be made under the Commission's oversight."  Otherwise, Carson opposed Turlock's protest and request for abeyance.

On May 22, 2023, FERC granted Turlock's request to hold the proceedings in abeyance "pending the necessary interconnection and transmission studies."  Specifically, it found "that an abeyance is warranted because Turlock has stated that it is ready and willing to provide service and that it will require a section 211 order to protect the tax-exempt status of its bonds.  An abeyance will provide the parties time to continue moving

---

[1] Absent from our record, among other things, is CMD's application and Turlock's protest and motion.  However, FERC's May 22, 2023, order summarizes both.

4.

through Turlock's procedures by completing the necessary studies and identifying needed upgrades. Turlock has indicated that an [IFS], a Transmission System Impact Study, and a Transmission Facilities Study still need to be completed."  (Fn. omitted.)

FERC indicated that it "require[d] additional information" to issue a final order. To obtain that information, "Carson must sign the study agreements and pay for further studies and Turlock must complete those studies to understand the impacts of the Project on its electric system and to identify any needed system upgrades to ensure that the operation of the Project will not result in any violations of the applicable reliability criteria. We find that this information is necessary before we can issue a proposed order in this case. Without this information, we cannot determine whether the reliability of Turlock's system will be unreasonably impaired by an order directing Turlock to provide transmission service to Carson."  (Fn. omitted.)

In other words, FERC required the "completion of and payment for interconnection and transmission studies, including interconnection-related system impact studies and facilities studies as well as transmissions related studies" before it could issue a proposed interconnection order.

FERC also ordered the parties to "submit an informational status report (either jointly or independently) regarding these study agreements and the related progress on study completion to the Commission within 60 days of the date of this order, explaining whether they have successfully entered the necessary agreements and the estimated timeline for completion of the remaining interconnection and transmission studies. At that time, the Commission may take further action."

While this appeal was pending, FERC issued another order in the administrative proceedings involving the parties.  (See *CMD Carson, LLC* (August 15, 2024) 188 FERC

¶ 61127 [2024 WL 3845972].)[2] FERC rejected Carson's request for a settlement judge because it was "unable to determine if there are genuine issues of material fact absent completed interconnection and transmission studies." (*Id.*, at ¶ 21.) FERC noted the parties' inability to "come to agreement on how the Interconnection System Impact Study was completed, how to conduct the remaining necessary studies, and what confidentiality safeguards should be in place." (*Id.*, at ¶ 22.) But FERC declined, "at this time," to "prescribe any specific parameters for Turlock to reflect in its interconnection and transmission studies." (*Id.*, at ¶ 23.) Though FERC noted the existence of this pending litigation (*id.*, at ¶ 16, fn. 44), FERC did not comment on its propriety. FERC ultimately continued to hold the proceedings "in abeyance pending the necessary studies and identification of facilities, as discussed in the body of this order and the May 22 Order." (*Id.*, at *7.)

On January 15, 2025, prior to oral argument, FERC issued another order dismissing Carson's rehearing request as to the above order and granting clarification, (See *CMF Carson, LLC* (January 16, 2025) 190 FERC ¶ 61,023.) In relevant part, FERC clarified its prior order, stating, "We clarify that, [when the studies are completed and FEC reviews the results of the studies], Carson will have an opportunity to challenge the study results, including how the studies were performed and the system upgrade or other facilities that the study concludes must be built to facilitate interconnection of the project and provide transmission service." (*Id.*, at ¶ 23.)

**Federal Proceedings**

Turlock removed Carson's state court complaint to the United States District Court, Eastern District of California, claiming that Carson's suit was " 'nominally posited on state law breach of contract claims' " but is actually " 'dependent on whether

---

[2] Unfortunately, counsel for the parties did not inform the court about this order until the petition for rehearing was filed.

6.

[Turlock's] conduct conformed to the requirements of FPA Sections 210 and 212 (16 U.S.C. § 824i, 824k) and FERC orders and regulations issued under these provisions.' " (*Carson Hybrid Energy Storage, LLC v. Turlock Irrigation District* (E.D. Cal. June 21, 2023, No. 23-CV-460-JLT-EPG) 2023 WL 4104003, p. *4 (*Carson*).) However, the district court granted Carson's motion to remand the case to the state court. (*Id.*, at p. *7.)

The district court explained that Carson's "FERC petition does not allege that [Turlock] violated the FPA; it merely asks FERC to issue an interconnection order pursuant to its power under FPA Sections 210 and 211 because Carson's negotiations with [Turlock] were not ultimately fruitful." (*Carson*, *supra*, 2023 WL 4104003, at p. 5.) Further, the dispute in this case did not arise under the terms of a "FERC-approved tariff," thus, "[b]ecause FERC-approved tariffs are 'regulations' under the FPA, federal law" would apply if there were a FERC-approved tariff in play, but, since "there is no such tariff or other comparable rule or regulation underpinning Carson's claims," Carson's "breach of contract claim is [not] federally created." (*Ibid.*)

The court further determined that application of federal law was not necessary to the resolution of Carson's complaint because some of Carson's theories did not depend on any construction of federal law, nor was an adjudication of what constitutes "Good Utility Practice" a substantial question in this case. (*Carson*, *supra*, 2024 WL 4104003, at pp. *6–*7.) "[Turlock] has not demonstrated how FERC has the same comprehensive control over this dispute as in [other cases] when [Turlock] admits plainly that it does not maintain a FERC tariff and is exempt from FERC's rate regulation." (*Id.*, at p. *7.)

### Turlock's Demurrer

On July 13, 2023, Turlock demurred to Carson's complaint on the grounds that it failed to state facts sufficient to support any cause of action. (Code Civ. Proc., § 430.10, subd. (e).) Specifically, Turlock argued the injunctive relief sought by Carson conflicted with the FERC's May 22, 2023, order, which Turlock interpreted as directing Carson to

7.

pay for, and proceed with, the remaining studies, including the IFS. Turlock also argued that Carson's request for specific performance conflicted with FERC's purported directive that the parties continue the study process and report to FERC.

Carson filed an opposition arguing that (1) the May 22, 2023, order could not preempt its state lawsuit because it was not a federal law or federal regulation, (2) FERC's jurisdiction under the FPA does not include Carson's lawsuit, (3) there was no conflict between FERC's order and the relief Carson requested in its complaint, and (4) that 16 U.S.C. section 825i does not govern Carson's breach of contract claim. Carson did not request leave to amend.

On August 23, 2023, the trial court sustained Turlock's demurrer without leave to amend. The court held that Carson's breach of contract claim was "pre-empted by [FERC's] federal statutory jurisdiction over transmission of electrical energy and over interconnectional agreements emanating from the [FPA]." Further, it held that Carson's complaint was "specifically preempted" by its conflict with FERC's May 22, 2023, order.

On August 28, 2023, the trial court issued an order, upon the parties' stipulation, dismissing the case with prejudice.[3] Carson timely appealed on October 27, 2023.

## DISCUSSION

### I.     Standard of Review

"We review de novo an order sustaining a demurrer. [Citation.] Likewise, whether state law is federally preempted is a 'pure question of law' that we independently review. [Citation.] In deciding whether a demurrer was properly sustained, "[w]e are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the

---

[3] Though there appears to be no judgment issued in this case, and an order sustaining a demurrer without leave to amend is interlocutory and not appealable (*Forsyth v. Jones* (1997) 57 Cal.App.4th 776, 780), an exception exists where the trial court issues a written, signed order dismissing an action. (Code Civ. Proc., § 581d.) The order of dismissal constitutes a judgment and is "effective for all purposes." (*Ibid*.; *Brehm v. 21st Century Ins. Co*. (2008) 166 Cal.App.4th 1225, 1233–1234.)

8.

ruling, not its rationale." (*Center for Environmental Health v. Perrigo Co.* (2023) 89 Cal.App.5th 1, 16.) "We 'give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.' " (*Gallivan v. AT&T Corp.* (2004) 124 Cal.App.4th 1377, 1381.) "A judgment based on a dismissal must be affirmed if any of the grounds for demurrer raised by the defendant is well-taken and disposes of the complaint." (*Ibid.*)

## II.     Applicable Legal Principles

We conclude that the relief sought by Carson's complaint in the trial court is not preempted by FERC's exclusive jurisdiction under the FPA.  First, we examine relevant preemption principles and FPA provisions.  Second, we conclude that the scope of the FPA's delegation to FERC of the authority to order interconnection does not, with one exception, presently preempt the relief sought by Carson.  We reverse the judgment.

### A.     *Preemption Principles*

"The Supremacy Clause provides that 'the Laws of the United States' (as well as treaties and the Constitution itself) 'shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.' [U.S. Const.] Art. VI, cl. 2.  Congress may consequently pre-empt, i.e., invalidate, a state law through federal legislation.  It may do so through express language in a statute.  But even where ... a statute does not refer expressly to pre-emption, Congress may implicitly pre-empt a state law, rule, or other state action." (*Oneok, Inc. v. Learjet, Inc.* (2015) 575 U.S. 373, 376–377.)

Some decisions identify four species of federal preemption— express, conflict, obstacle, and field.  (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935.)  *Express preemption*, the easiest for courts to apply, occurs when Congress explicitly defines the extent to which its enactments preempt state law.  (*Id.* at p. 936.)  *Conflict preemption* occurs when it is impossible to simultaneously comply with both state and federal law.  (*Ibid.*)  *Obstacle preemption*

9.

arises when, in a particular case, the challenged state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. (*Ibid.*) *Field preemption* is Congress's intent to preempt all state law in a particular area and occurs where the scheme of federal regulation is sufficiently comprehensive to reasonably infer that Congress left no room for supplementary state regulation. (*Ibid.*) The burden of proving preemption is on the party claiming it applies, and courts are reluctant to infer preemption. (*Ibid.*)

Preliminarily, we conclude that no "presumption against preemption" exists in this case. (See *Wholesale Electricity Antitrust Cases I & II* (2007) 147 Cal.App.4th 1293, 1305 [discussing the presumption].) We agree with *Southern Cal. Edison Co. v. Public Utilities Com.* (2004) 121 Cal.App.4th 1303 (*Southern Cal. Edison*) that "as the field of interconnection [wholesale electricity distribution] agreements has a history of significant federal presence, the presumption against preemption is not applicable here." (*Id.*, at pp. 1311–1312.) However, this does not equate to a presumption that preemption applies.

Among the versions of implied preemption, conflict preemption primarily occurs in two situations: (1) "where it is impossible for a private party to comply with both state and federal law" and (2) "where 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 372–373.)

" '[T]he threshold for establishing' such an obstacle 'is demanding: "It requires proof Congress had particular purposes and objectives in mind [and] a demonstration that leaving state law in place would compromise those objectives …." ' [Citation]; see *Chamber of Commerce of the United States of America v. Whiting* (2011) 563 U.S. 582, 607 … (plur. opn. of Roberts, C.J.) [a ' "high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act" ']. ' "[P]reemption

10.

analysis is not '[a] freewheeling judicial inquiry into whether a state statute is in tension with federal objectives' " ' [citation], but a focused inquiry into 'whether there exists an irreconcilable conflict between the federal and state regulatory schemes [citation.]' 'The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute.' " (*County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 628–629 (*County of Butte*).)

Field preemption applies where federal law is so comprehensive that we may reasonably infer that Congress excluded state regulation, even if there is an " 'absence of express pre-emptive language.' " (*McKenney v. Purepac Pharmaceutical Co*. (2008) 167 Cal.App.4th 72, 79–80; *Kemp v. Superior Court.* (2022) 86 Cal.App.5th 981, 997.) In other words, the federal regulatory scheme must be " 'so pervasive that there is a reasonable inference Congress intended to dominate the field[.]' " (*Cellphone Termination Fee Cases* (2011) 193 Cal.App.4th 298, 316, fn. 17.) "Field preemption requires not only a determination that Congress intended to occupy the field, but consideration of what the 'boundaries of the pre-empted field' are." (*County of Butte, supra*, 13 Cal.5th at pp. 630–631.)

Thus, even where a federal law or regulation expressly preempts state law, a court must still inquire about the " 'substance and scope of Congress' displacement of state law[.]' " (*Espinoza v. Hepta Run, Inc*. (2022) 74 Cal.App.5th 44, 53 (*Espinoza*).) This includes agency regulations. A federal agency's non-arbitrary promulgation of regulations within its statutory authority has preemptive effect. (*Ibid*.) "A federal agency's preemption determination based on interpretations of its own regulations and of the statutory scheme it administers should be accorded substantial deference." (*Ibid*.)

### B.     *Federal Power Act and FERC's Authority*

### 1.     The Federal Power Act

The FPA empowers FERC to govern the interstate sale and transmission of electricity and any facility for such transmission or sale of electric energy. (16 U.S.C.

§ 824(a), (b)(1).) FERC's jurisdiction is greatest over "public utilities," which are, in fact, private sellers of electricity. (*In re Electric Refund Cases* (2010) 184 Cal.App.4th 1490, 1496.) They must file with FERC a "tariff" that lays out, in relevant part, the procedures and *agreements*, including an ISISA, similar in terms to the one in this case, necessary for an applicant to interconnect with that public utility. (18 C.F.R. §§ 35.1(a), 35.10a(a); Standardization of Generator Interconnection Agreements and Procedures (July 24, 2003) 104 FERC ¶ 61103 [2003 WL 21725988], Appendix 3 [containing *pro forma* ISISA].)

Once approved by FERC, an agreement like the ISISA "is part of a FERC-filed tariff," taking on "the same legal force as a federal regulation." (*Central Iowa Power Co-op v. Midwest Independent Transmission System Operator, Inc.* (8th Cir. 2009) 561 F.3d 904, 913; see 18 C.F.R. § 35.2(c)(1) [defining "tariff" in part as "all classifications, practices, rules, or regulations which in any manner affect or relate to" electric service].)

However, "non-public" utilities, including governmental entities like Turlock, are largely exempt from FERC's jurisdiction (16 U.S.C. § 824(f); *In re Electric Refund Cases*, *supra*, 184 Cal.App.4th at p. 1496), except that, as relevant here, FERC may order "non-public" utilities to provide interconnection and transmission services to an applicant. (16 U.S.C. §§ 796(22)–(23), 824i(a)(1), 824j(a), 824j-1(a)–(b).) Nothing in the FPA or implementing regulations requires "non-public" utilities to file a tariff or agreement with FERC. In this case, Turlock is a "non-public" utility, and, according to the record, did not file a tariff containing the ISISA, or the ISISA itself, with FERC.

The parties debate the scope of FERC's interconnection authority. That authority is governed by 16 U.S.C. section 824i titled "Interconnection authority." It vests FERC with authority to, as relevant here, order "physical connection" of an electric utility like Turlock and a utility applicant like Carson. (16 U.S.C. § 824i(a)(1)(A).) FERC may also order other actions necessary for interconnection, e.g., (1) any "action as may be necessary to make effective any physical connection described in subparagraph (A)"

12.

(16 U.S.C. § 824i(a)(1)(B)), and (2) "such increase in transmission capacity as may be necessary to carry out the purposes of any order under subparagraph (A) or (B)."[4] (16 U.S.C. § 824i(a)(1)(D).)

To make any of these orders, FERC must determine an order (1) "is in the public interest," (2) would "encourage overall conservation of energy or capital," "optimize the efficiency of use of facilities and resources," or "improve the reliability of any electric utility system or Federal power marketing agency to which the order applies," and (3) meet "the requirements of [16 U.S.C.] section 824k[.]" (16 U.S.C. § 824i(c).) FERC must engage in a similar analysis where a utility applies for transmission service. (See 16 U.S.C. §§ 824j, 824k.)

Given we accord "substantial deference" to an agency's reasonable interpretation of its regulatory authority under the statutory scheme it administers (*Espinoza*, *supra*, 74 Cal.App.5th at p. 53), we discuss FERC's own decisional authority and consider how it analyzes its interconnection authority under the FPA. In doing so, we determine the " 'substance and scope of Congress' displacement of state law' " by first looking to FERC's own analysis of its jurisdiction. (*Ibid*.)

## 2. Relevant FERC Cases

FERC has determined that its jurisdiction is not unlimited even if a breach of contract dispute concerns a FERC-jurisdictional agreement. In *Cottonwood Wind Project, LLC v. Nebraska Public Power District, Inc*. (June 17, 2016) 155 FERC ¶ 61285 [2016 WL 3405305] (*Cottonwood*), FERC dismissed Cottonwood's FERC complaint for monetary damages against Nebraska Public Power District (NPPD) for breach of NPPD's

---

[4] We do not agree with Turlock's argument that the legislative history behind the FPA shows that this dispute is within the FPA's preemptory ambit. The legislative history quoted by Turlock, discussing FERC's authority to approve an agreement privately and voluntarily reached by the parties (see 123 Cong. Rec. 32,398 (1977) [statement of Sen. Johnston]), does not answer the question at issue here: whether the FPA grants FERC *exclusive* authority to adjudicate a breach of contract dispute.

13.

Generator Interconnection Agreement (Cottonwood GIA) among Cottonwood (interconnection customer), NPPD (transmission owner) and Southwest Power Pool, Inc. (transmission provider). (*Id*., at ¶ 1.) Cottonwood alleged NPPD breached the Cottonwood GIA because NPPD undertook various construction-related acts before obtaining Cottonwood's approval as required by the Cottonwood GIA. (*Id*., at ¶ 7.) NPPD sought dismissal of the complaint because FERC's "jurisdiction is not exclusive where a dispute involves interpretation and application of contract terms and does not challenge the reasonableness of rates or a term or condition of service," and NPPD contended FERC should decline to exercise primary jurisdiction over the dispute. (*Id*., at ¶ 18.)

FERC agreed. It determined that simply because a dispute arises under the "*pro forma* terms of a GIA[5] does not compel [FERC] to assert jurisdiction over allegations of breach of contract." (*Cottonwood*, *supra*, 2016 WL 3405305, at ¶ 27.) FERC acknowledged that, "[i]n cases of contract interpretation, [FERC] has concurrent jurisdiction with the courts, and whether to exercise primary jurisdiction is a matter solely within [FERC's] discretion." (*Ibid.,* fn. omitted.) Applying the factors set forth in *Arkansas Louisiana Gas Co. v. Hall* (May 18, 1979) 7 FERC ¶ 61175 [1979 WL 437189] (*Arkla*), FERC concluded that the case was inappropriate for FERC's consideration primarily because it concerned only the interpretation of the Cottonwood GIA "in light of the parties' actions" and not a determination that "any term of the Cottonwood GIA is unjust or unreasonable." (*Cottonwood*, at ¶¶ 27–30.)

In *Kentucky Utilities Company* (March 15, 2005) 110 FERC ¶ 61285 [2005 WL 591921] (*Kentucky*), Owensboro Municipal Utilities (Owensboro) sued Kentucky Utilities Company (Kentucky) in state court, requesting " 'the Court declare the rights

---

[5] Our understanding is that this means the interconnection agreement was filed with FERC and is thus a FERC-jurisdictional agreement. (See *Cottonwood*, *supra*, 2016 WL 3405305, at ¶¶ 2–6.)

and duties of' Owensboro and 'Kentucky under the contract' " and order Kentucky to pay damages. (*Id*., at ¶ 2.) The agreement at issue was "a longstanding wholesale electricity contract that includes rates, terms, and conditions of service for certain wholesale sales of electric energy in interstate commerce." (*Id*., at ¶ 3.) Kentucky requested FERC exercise its exclusive jurisdiction over the breach of contract dispute because the interpretation of the contract in the lawsuit "could change wholesale electricity rates charged under the contract" and "reviewing such rates is at the core of [FERC]'s responsibility under the [FPA]." (*Id*., at ¶ 10.) FERC disagreed, reasoning as follows:

> "Owensboro's complaint filed in the [trial court] asks the court to 'declare the rights and duties of' the parties 'under the Contract' and award damages to the extent that Kentucky has failed to comply with the contract. Owensboro requests, *inter alia*, that the court determine how to apply the definition of 'incremental energy cost.' Owensboro argues in its complaint that its contract with Kentucky requires Kentucky to exclude from such incremental energy cost any demand charge, whether separately stated or not. *Owensboro does not ask the court to find any provisions of the contract unreasonable or unenforceable*. In short, Owensboro seeks an interpretation and enforcement of the contract's existing provisions, *not a change in the contract*." (*Kentucky*, *supra*, 2005 WL 591921, at ¶ 10, emphasis added.)

Similarly, in *Southwest Power Pool* (August 22, 2022) 180 FERC ¶ 61110 [2022 WL 3594975], FERC, acknowledging its "exclusive authority" over electric energy wholesale in interstate commerce and any rule or practice affecting such rates, nevertheless determined that the breach of contract issue in that case related "not directly" to that exclusive authority but rather "to contract law and tort claims regarding whether alleged obligations under purported contracts have been upheld." (*Id*., at ¶ 56.) FERC went on to apply the *Arkla* factors and deemed it appropriate to exercise its jurisdiction over the dispute. (*Id*., at ¶ 58.)

Turlock refers us to the *East Kentucky Power Cooperative* series of cases. (See *East Kentucky Power Cooperative, Inc*. (April 14, 2005) 111 FERC ¶ 61031 [2005 WL 853861]; *East Kentucky Power Cooperative, Inc.* (August 3, 2005) 112 FERC ¶ 61160 [2005 WL 1826526]; *East Kentucky Power Cooperative, Inc*. (January 19, 2006) 114 FERC ¶ 61035 [2006 WL 147539]; order on reh'g, *East Kentucky Power*

15.

*Cooperative, Inc.* (June 20, 2006) 115 FERC ¶ 61347 [2006 WL 1689002]; order on compliance, *East Kentucky Power Cooperative, Inc.* (July 20, 2006) 116 FERC ¶ 61072 [2006 WL 2037318] [collectively "*E. Ky. Power Coop.* cases"].)  These cases involved the East Kentucky Power Cooperative's (EKPC) application for an order directing interconnection with the Tennessee Valley Authority (TVA) in order for EKPC to provide required service to Warren Rural Electric Cooperative Corporation (Warren).  Part of EKPC's application contested the "base case" used during the System Impact Study.  (*East Kentucky Power Cooperative, Inc., supra,* 2005 WL 853861], at ¶¶ 8–11.)  EKPC argued the base case should be based on the present status quo, while TVA argued it should be premised on the assumption that "Warren's load on the TVA transmission system and its interconnections do not exist[.]"  (*Id*., at ¶ 11.)

We find the *E. Ky. Power Coop.* cases inapplicable here.  No doubt FERC has jurisdiction to direct the terms of interconnection within the scope of its regulatory duties under the FPA:  ensuring system reliability, quality, etc.  (See 16 U.S.C. §§ 824i, 824j, 824k.)  But these cases do not involve an alleged breach of a contract, only a dispute over which parameters to apply to a base case study.  (See *East Kentucky Power Cooperative, Inc., supra,* 2005 WL 853861, at ¶ 40.)

Here, Carson is not requesting the trial court to determine which of two competing methodologies to apply to a base case study.  Rather, Carson requests the court, in part, to enforce the agreed-upon terms of the ISISA.  At this point, interpreting Carson's complaint under the standards applicable to a demurrer, Carson is not requesting the court to determine the reasonableness of the study's findings, their implications for the system's reliability, or any other areas subject to FERC's regulatory duties under the FPA.  Even if Carson succeeds in court, and Turlock must redo the study, FERC could still reject the results or order it redone under different parameters.

16.

### 3. Relevant Federal Authorities

Consistent with FERC's own analysis of its jurisdiction, federal courts have concluded the same. For example, the mere fact that a breach of contract dispute concerns a FERC-filed tariff does not "convert[ ] every legal dispute implicating the [FERC-filed agreement] into one over which the FERC exercises exclusive jurisdiction." (*Central Iowa Power Co-op. v. Midwest Independent Transmission System Operator, Inc.* (8th Cir. 2009) 561 F.3d 904, 913; accord, *In re Mirant Corp.* (5th Cir. 2004) 378 F.3d 511, 519 [though FPA preempts breach of contract claims challenging FERC-filed rates, "the FPA does not provide FERC with exclusive jurisdiction over the breach of a FERC approved contract" to the extent the claimed breach does not challenge the filed rate].) Thus, "[i]t is well established that district courts and FERC share concurrent jurisdiction over cases interpreting contracts and settlement agreements." (*Narragansett Elec. Co. v. Constellation Energy Commodities Group, Inc.* (D.Ct. Rhode Island 2007) 526 F.Supp.2d 260, 269; *City of Osceola, Ark. v. Entergy Arkansas, Inc.* (8th Cir. 2015) 791 F.3d 904, 908; *City of Chanute, Kan. v. Kansas Gas and Elec. Co.* (D.Ct. Kansas 2007) 2007 WL 1041763, at *6, fn. 60; *Portland General Elec. Co. v. City of Glendale* (D.Ct. Oreg. 2007) 2007 WL 1655545 (*Portland*), at *6.)

### C. *Analysis*

### 1. Concurrent Jurisdiction

Given these authorities, though there is a significant federal presence in the field of interconnection agreements (*Southern Cal. Edison*, *supra*, 121 Cal.App.4th at p. 1312), the scope of that field preemption does not extend to this case. Contrary to Turlock's position and the trial court's order sustaining Turlock's demurrer below, we do not read *Southern Cal. Edison* as standing for the extremely broad proposition that any litigation relating to FERC's interconnection authority under the FPA is preempted.

*Southern Cal. Edison* concerned whether, to upgrade electrical grid infrastructure at the point of interconnection, a generator of energy or a public utility must pay the up-

17.

front costs. (*Southern Cal. Edison*, *supra*, 121 Cal.App.4th at pp. 1304-1305.) FERC issued an order requiring the former. But the California Public Utilities Commission's (PUC) interpretation of California Public Utilities Code section 399.25 held the latter. (*Ibid.*) The court held that, because the FPA accords FERC broad authority over the field of interconnection agreements, and FERC issued the Standard Interconnection Agreement Order promulgating the rule requiring generators of energy to pay, the PUC's interpretation was preempted. (*Id.*, at pp. 1311–1313.)

We do not read *Southern Cal. Edison* as a broad decision. First, unlike this case, it does not concern the breach of a non-approved agreement. This demarcates the preemption question in this case. In *Southern Cal. Edison*, that question concerned the PUC's authority to issue a regulation on an issue already conclusively determined by FERC. Here, the question is whether FERC's authority preempts a common law cause of action. As discussed, FERC has held that it shares concurrent jurisdiction in cases like these where a party, like Carson, seeks to enforce the terms of a contract.

We do not disagree with *Southern Cal. Edison*'s implicit conclusion that FERC has exclusive jurisdiction to regulate interconnection. But Carson is not asking the trial court to regulate interconnection, but rather to enforce the terms of an agreement. That juridical act may impact the future terms of interconnection, but the mere fact that an action to enforce a contract may affect interconnection, or even filed rates, does not render the dispute within FERC's exclusive jurisdiction. (*Kentucky*, *supra*, 2005 WL 591921, at ¶ 10.) Carson's complaint does not ask the trial court to adjudicate the unreasonableness or unjustness of the study that will set the terms for interconnection and transmission, only to enforce the agreed to terms.

Certainly, other aspects of Carson's requested relief do not fall squarely within FERC's jurisdiction. The requests in the complaint's prayer— paragraphs four and five (to provide invoices) and six (to permit Carson to arrange for payment of vendors)— are clearly not preempted. Even if other relief in Carson's prayer is preempted, these are

18.

clearly state law contract issues. (See, e.g., *Gulf States Utilities Co. v. Alabama Power Co.* (5th Cir. 1987) 824 F.2d 1465, 1471–1474 [holding preemption of some of the plaintiff's claims, permitting others to go forward in the district court, and upholding the district court's refusal to stay the case despite pending proceedings before FERC].)

We also conclude that this case is materially distinguishable from other cases upon which Turlock relies: *Transmission Agency of Northern California v. Sierra Pacific Power Co.* (9th Cir. 2002) 295 F.3d 918 (*TANC*) and *County of Stanislaus v. Pacific Gas and Elec. Co.* (9th Cir. 1997) 114 F.3d 858 (*Cty. of Stanislaus*).

In *TANC*, the Transmission Agency of Northern California (TANC) sued various entities involved in the construction and interconnection of an electricity intertie called the Alturas Intertie, which TANC alleged interfered with agreements for electric transmission already in place. (*TANC*, *supra*, 295 F.3d 918, 922, 926.) TANC had entered various agreements with some defendants to construct electricity interties, including the California–Oregon intertie. (*Id.*, at p. 923.) Prior to the Alturas Intertie's operation, FERC denied TANC's protest against the intertie, in which TANC argued the project would reduce the capacity of the California–Oregon intertie, and approved the project. After the Alturas Intertie commenced operation, FERC commenced proceedings to address allegations regarding the reduction of the California–Oregon intertie's capacity and related issues. (*Id.*, at p. 924.)

The Ninth Circuit Court of Appeals affirmed the district court's order granting the defendants' motion to dismiss. The court concluded that "TANC cannot obtain state law money damages allegedly resulting from the operation of an interstate electricity intertie expressly approved by FERC, where the manner of operation was necessarily contemplated at the time of approval." (*TANC, supra*, 295 F.3d at p. 928.)

In our view, the *TANC* court's reasoning is inapplicable here. For example, if FERC had already issued or approved an interconnection agreement, and Carson sought to modify or allege the breach of that agreement in state court, the action would likely be

19.

preempted. However, FERC has yet to exercise jurisdiction over or determine the state law breach of contract issues present here. FERC's prior decisions holding, in similar cases, that it has concurrent jurisdiction counsel us that, unlike in *TANC*, FERC has not yet issued a final decision that preempts this lawsuit.

In *Cty. of Stanislaus*, the Ninth Circuit Court of Appeals held that an antitrust action regarding whether certain behavior by Pacific Gas and Electric Company leading to FERC's approval of natural gas importation, transportation, and sales was properly dismissed as contravening the filed rate doctrine. (*Cty. of Stanislaus*, *supra*, 114 F.3d at p. 860.) In essence, the filed rate doctrine is a deferential rule whereby an agency's approval of rates establishes those rates as " 'reasonable and nondiscriminatory.' " (*Id*., at p. 862; see also *Nantahala Power & Light Co. v. Thornburg* (1986) 476 U.S. 953, 973 (*Nantahala*) [filed rate doctrine applied to state law claims that utility received an unreasonable quantity of power].) The court held that the complaint seeking damages based in part on the rate filed with and approved by FERC should be dismissed as clearly implicating the filed rate doctrine. (*Cty. of Stanislaus*, *supra*, at p. 864.)

But nothing in *Cty. of Stanislaus* or *Nantahala* affects this case. Turlock interprets Carson's complaint as challenging "Turlock's allocation of the costs to mitigate the reliability impacts caused by its proposed interconnection[.]" But Turlock is not FERC. Turlock presents no authority suggesting its decisions are protected by the filed rate doctrine or any analogous rule. Further, Carson's complaint, at this point, requests the trial court to enforce the contract, not to determine the justness or reasonableness of Turlock's conduct beyond the contract's terms. FERC's issuance of an order resolving the parties' ISISA dispute may change this analysis, but FERC has not yet issued such an order. We therefore find these cases inapplicable.

Further, we are unpersuaded that conflict, impossibility, objection, or any other species of preemption applies. Our review of the filings submitted to FERC to which the parties point us discloses no order by FERC that adjudicates the relief requested by

20.

Carson's state court complaint.[6] Turlock's hypotheses about future conflicts are unpersuasive. The demanding threshold to establish conflict preemption is not met by threats of " 'a hypothetical or potential conflict[.]' " (*County of Butte*, *supra*, 13 Cal.5th at p. 629.) That FERC may yet take action that would conflict with Carson's lawsuit is insufficient to establish conflict preemption. FERC has only indicated its need for additional information to complete its analyses under the FPA, but FERC has not, in our view, definitively stated that it has determined Carson's claims about the ISISA are unmeritorious.

---

[6] Turlock submitted two requests for judicial notice. The December 2, 2024 request for judicial notice requests that we judicially notice approximately 600 pages of the parties' filings in the adjacent FERC proceedings, most of which could have been provided to this court prior to our initial determination in this case. Though we judicially notice existence of these documents (*Adams v. Bank of America, N.A.* (2020) 51 Cal.App.5th 666, 673–674), we have reviewed only those filings to which the parties direct us. We do not perform an unassisted review of the record on appeal. (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.) We grant the January 16, 2025 request for judicial notice of FERC's January 15, 2025 order. (Evid. Code, § 452, subd. (c).)

Five days prior to oral argument, Carson requested judicial notice of five items: (1) an agreement between a third party and Turlock, (2) a California Department of Water Resources decision that a project not mentioned in Carson's complaint is exempt from the California Environmental Quality Act, (3) a report by the Department of Water Resources about the Electricity Supply Reliability Reserve Fund, (4) Assembly Bill 205, and (5) Assembly Bill 209.

We deny Carson's request as to items (1)–(3). The first appears to be a private contract not properly subject to judicial notice. (Evid. Code, § 451, subd. (c).) Even if it is, as Carson contends, an act of the Department of Water Resources, as are (2) and (3), judicial notice of acts of a state legislative, executive, or judicial department is discretionary. (Evid. Code, § 452, subd. (c); *Coastal Protection Alliance Inc. v. Airbnb, Inc.* (2023) 95 Cal.App.5th 207, 220 [agency-issued reports and agency interpretation of statutory language].) We decline to grant judicial notice. Not only do these items not affect our opinion, but we lack any exceptional circumstances that compel us to grant judicial notice where it appears Carson had opportunity to present these items to the trial court or our court sooner but did not. (See *Marriage of Brewster & Clevenger* (2020) 45 Cal.App.5th 481, 498.) Finally, though we must judicially notice items (4)–(5) as statutory law (see Evid. Code, § 451. Subd. (a)), they do not affect our decision.

Rather, in its January 15, 2025 order, FERC clarified that Carson "*will* have an opportunity to challenge the study results, including how the studies were performed and the system upgrade or other facilities that the study concludes must be built to facilitate interconnection of the project and provide transmission service[.]" (*CMD Carson, LLC* (January 16, 2025) 190 FERC ¶ 61,023, at ¶ 23.) Insofar as FERC is referring to the ISISA breach of contract dispute, nothing in FERC's statement of Carson's *future* opportunity to raise this challenge dissuades us that FERC has asserted primary jurisdiction over the dispute. Even if FERC will do so, other alleged breaches of the ISISA— e.g., failure to provide invoices— are likely not part of the relief Carson may obtain from FERC at a later juncture. The issue of the application and scope of preemption is not yet defined. We believe that further litigation, proceedings before FERC on the issue of jurisdiction, or a request to exercise primary jurisdiction in the trial court may clarify these issues.

Carson's breach of contract claims and remedies regarding the ISISA are thus not preempted by the FPA. FERC has, at most, concurrent jurisdiction over this dispute. Both parties may seek a more affirmative statement of FERC's jurisdiction from FERC itself. If FERC renders a definitive statement regarding its jurisdiction over this dispute, the parties have avenues in state court to enforce FERC's exercise of its jurisdiction.

We also disagree with Turlock that permitting this lawsuit to go forward would interfere with FERC's jurisdiction to adjudicate the terms of the final interconnection agreement between the parties. We understand the ISISA report to fall prior to subsequent studies and the final approval of interconnection and transmission terms by FERC. We understand that FERC could adjust these terms, order new studies, or take other such action. But Carson is not asking, at this time, the trial court to fulfill that role, only to enforce the terms of the parties' contract.

### 2.     Injunctive Relief

The FPA does not expressly grant FERC power to issue injunctive relief.  Rather, the FPA permits FERC to "bring an action … to enjoin" conduct that may violate the FPA or "to enforce compliance with this chapter or any rule, regulation, or order thereunder[.]"  (16 U.S.C. § 825m, subd. (a).)

The FPA provides the requirements for a good faith request for transmission services.  (See 18 C.F.R. § 2.20.)  Only if a good faith transmission request is made in accordance with 18 C.F.R. section 2.20's provisions can FERC "issue an order requiring a transmitting utility to provide transmission services[.]"  (18 C.F.R. § 2.20(a)(2).)  FERC applies the policies outlined in 18 C.F.R. section 2.20 "when determining whether and when a 'good faith' request for service was made."  (18 C.F.R. § 2.20(a)(3).)  However, the parties do not point us to, nor can we find, any parallel provision for requests for interconnection.

Here, FERC determined that Carson's good faith request "was properly submitted and that it was inappropriate for Turlock to unilaterally deem Carson's good faith request withdrawn."  (*CMD Carson, LLC*, 2024 WL 3845972, at ¶ 5.)  Though the use of "good faith" clearly implicates 18 C.F.R. section 2.20, governing requests for transmission service, it is unclear to us whether FERC's order also governs Carson's request for interconnection.  Though the parties disagree on this question, neither cites any dispositive authority as to whether FERC's order governs Carson's request for interconnection and position in Turlock's interconnection queue.  Put differently, it could be that Carson's good faith request is synonymous with its position in Turlock's interconnection queue such that, if the request is withdrawn, then Carson loses its position in Turlock's queue.  But we can find nothing in the parties' briefs, the record, nor our own research to suggest that this would be the case.

Given the dearth of information on this issue, we decline to hold that FERC's decision that Turlock cannot yet withdraw Carson's good faith *transmission* request

23.

implicitly prohibits Turlock from withdrawing Carson's interconnection request. Insofar as Carson's request for injunctive relief in the trial court pertains to its transmission request, it is preempted because FERC has already exercised its authority under 18 C.F.R. section 2.20.

However, insofar as Carson's request pertains to its interconnection request, we do not find that, at this time, it is preempted. If FERC declines to exercise primary jurisdiction over the breach of contract dispute, it makes little sense that the trial court could then adjudicate the breach of contract dispute but have no authority to maintain the status quo pending that resolution. Again, the parties have procedural options available. For example, the parties could seek a declaration from FERC clarifying the scope of its authority, and over what issues FERC will, or will not, exercise authority.

### 3. Primary Jurisdiction

For this reason, we decline Turlock's request to decide whether primary jurisdiction exists. " 'The doctrine of primary jurisdiction … is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.' " (*Fairless Energy, LLC v. Federal Energy Regulatory Commission* (D.C. Cir. 2023) 77 F.4th 1140, 1147 (*Fairless*).) " ' "Primary jurisdiction" … applies where a claim is originally cognizable in the courts, and … enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body[.]' " (*Ibid.*)

No fixed formula exists for primary jurisdiction, but as noted, FERC considers three factors: (1) whether it has special expertise rendering the case appropriate for its decision; (2) whether uniformity of interpretation for the type of issue in dispute is necessary; and (3) whether the case is important to FERC's regulatory responsibilities. (*Fairless*, *supra*, 77 F.4th at p. 1147.) " 'Whether to exercise primary jurisdiction is a matter solely within the Commission's jurisdiction.' " (*Ibid.*)

24.

"Pursuant to the doctrine of primary jurisdiction, a district court may, under narrow circumstances, elect in its discretion to refrain from exercise of jurisdiction in favor of permitting a federal agency with applicable regulatory authority to decide threshold matters relevant to the dispute." (*Portland General Elec. Co. v. City of Glendale* (D.Ct. Org. June 1, 2007, No. 05-1321-PK) 2007 WL 1655545, at *7.) A court may accordingly exercise its discretion in two ways: it " 'may stay the case and retain jurisdiction or, "if the parties would not be unfairly disadvantaged, … dismiss the case without prejudice." ' " (*Nutrition Distribution, LLC v. IronMag Labs, LLC* (9th Cir. 2018) 723 Fed.Appx. 397, 398 (*Nutrition Distribution*); see also *Elder v. Pacific Bell Telephone Co.* (2012) 205 Cal.App.4th 841, 854–855.)

Even if an issue "does not fall within FERC's exclusive jurisdiction," a question may be referred to FERC under the primary jurisdiction doctrine where, in the court's discretion, the issue would be best addressed by the agency's expertise. (*Michigan Elec. Transmission Co. v. Midland Cogeneration Venture, Ltd. Partnership* (E.D. Mich. 2010) 737 F.Supp.2d 715, 733, citing *Reiter v. Cooper* (1993) 507 U.S. 258, 268 [noting that when primary jurisdiction applies, a court "stay[s] further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling"].)

California courts are also empowered to stay a case to await an administrative decision under the primary jurisdiction doctrine. (See *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 398 ["We conclude that in determining whether it is appropriate to issue a stay of judicial proceedings in order to permit administrative action under the primary jurisdiction doctrine, we must confine our analysis to the complaint as written"].)

We decline Turlock's request to apply the doctrine of primary jurisdiction at this time. Our record contains no request by any party that the trial court stay the case to afford the parties reasonable time to seek clarification from FERC of its jurisdiction over this dispute. Commensurate with the primary jurisdiction doctrine, courts have

" 'inherent powers … to insure the orderly administration of justice.' " (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 266.)  But the court was never afforded an opportunity to exercise its discretion under the primary jurisdiction doctrine.  (*Bradley v. CVS Pharmacy, Inc*. (2021) 64 Cal.App.5th 902, 913 [decision to apply primary jurisdiction or equitable abstention doctrine reviewed for abuse of discretion]; see also *Nutrition Distribution*, *supra*, 723 Fed.Appx. at p. 398.)  Nothing in this opinion prejudices either party from requesting that the court apply the doctrine of primary jurisdiction to stay the underlying litigation.

## DISPOSITION

The judgment is reversed.  We remand the case to the trial court for further proceedings consistent with this opinion.  Carson shall recover its costs on appeal.


SNAUFFER, J.

WE CONCUR:


PEÑA, Acting P. J.


SMITH, J.